IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

APRIL KING,

              Plaintiff,

       vs.                          Civil Action 2:05-CV-966
                                    Magistrate Judge King

STATE OF OHIO, *et al.*,

              Defendants.


### OPINION AND ORDER

        This is a civil rights action under 42 U.S.C. §§ 1983 and 2000e-
5,[1] in which plaintiff, formerly a corrections officer, claims that the
termination of her employment, purportedly because she violated rules
prohibiting personal relations with current or former inmates, was
effected in contravention of her rights under the Constitution and
because of her sex and race.  Plaintiff also challenges the relevant
rules under the First Amendment.  With the consent of the parties, *see*
28 U.S.C. §636(c), this matter is before the Court on the motion for
summary judgment filed on behalf of defendants State of Ohio, Reginald
Wilkinson, Terry Collins, Paul Arledge, Cary Sayers, D.J. Norris and
William Blaney (collectively, "defendants").[2]  *Motion for Summary
Judgment, or in the Alternative, for Qualified Immunity, of Defendants
State of Ohio, Reginald Wilkinson, Terry Collins, Paul Arledge, Cary*

_____

        [1]In her memorandum *contra* the defendants' prior motion to dismiss, Doc. No. 9,
plaintiff voluntarily dismissed with prejudice her claim under 42 U.S.C. § 1985, Count
Two of the *First Amended Complaint*, Doc. No. 2 ("*First Am. Comp.*").  *See Plaintiff's
Memorandum Contra Defendant's* [sic] *Motion to Dismiss*, Doc. No. 14, p. 2.  *See also
Opinion and Order*, Doc. No. 28, p. 3.  Accordingly, as to the defendants' request to
dismiss plaintiff's claim under Section 1985, the *Motion for Summary Judgment* is
**DENIED as moot**.

        [2]The motion for summary judgment was not filed on behalf of defendant David M.
Pincus, identified in the *Amended Complaint*, Doc. No. 2, as a state arbitrator.  The
docket does not reflect either service of process on this defendant or waiver of
service.  *See Waiver of Service,* Doc. No. 3.  No appearance has been made by or on
behalf of this defendant.  *See Motion to Dismiss*, p.2 n.1, Doc. No. 9; *Answer*, Doc.
No. 66.

*Sayers, D.J. Norris & William Blaney*, Doc. No. 61 ("*Motion for Summary Judgment*"). For the reasons set forth below, the *Motion for Summary Judgment* is **GRANTED**.

## I.    BACKGROUND

### A.    Ohio Department of Rehabilitation and Correction Standards of Employee Conduct

The Ohio Department of Rehabilitation and Correction ["ODRC"][3] has promulgated Standards of Employee Conduct applicable to all employees. The standards aim "to inform all employees of the Ohio Department of Rehabilitation and Correction of the Department's standardized rules of conduct. All Ohio Department of Rehabilitation and Correction employees are subject to these standards. Some of the Standards may have their basis in statutory or regulatory provisions, based upon the reality of working within a correctional setting." Exhibits 3 (effective October 1, 2001) and 4 (effective October 17, 2004), p.1, attached to *Deposition of Toni Brooks,* Doc. No. 60 ("*Brooks Depo.*"). *See also* Exhibit H, attached to *King Depo.* The standards not only define performance standards, but also establish a range of discipline for violations of those standards. *See id.* Discipline, which ranges from oral reprimand to removal from employment, is intended to be progressive. *King Depo.*, Exh. H, p.8. Moreover, the appointing authority is expected to consider the facts underlying the particular violation as well as "prior disciplinary history, length of time since the last discipline and mitigating and aggravating circumstances." *Id.*

---

[3]Defendant Reginald Wilkinson is the former director of ODRC; defendant Terry Collins subsequently replaced Defendant Wilkinson as director. *First Am. Comp.*, ¶¶ 4-5; *Motion to Dismiss*, p. 2.

Rule 46 of the Standards of Employee Conduct addresses "unauthorized relationships," *Brooks Depo.*, Exh. 3, pp. 17-18; *King Depo.*, Exh. H, pp. 17-18, and expressly forbids

    A.    The exchange of personal letters, pictures, phone calls or information with any individual under the supervision of the Department or friends or family of same, without express authorization of the Department.

    B.    Engaging in any other unauthorized personal or business relationship(s) with any individual currently or formerly under the supervision of the Department or friends or family of same.

    C.    Visiting with any individual under the supervision of the Department without express authorization of the Department.

    D.    Residing with any individual under the supervision of the Department without express authorization of the Department.

    E.    Committing any sexual act with any individual under the supervision of the Department.

    F.    Engaging in any other sexual conduct with any individual under the supervision of the Department.

    G.    Aiding and abetting any unauthorized relationships.

Authorized discipline for a first violation of the rule ranges from a two-day suspension or fine to removal; a second offense may be punished by either a five-day suspension or fine or removal. *Id.*

**B.    Plaintiff's Employment with the ODRC**

Plaintiff is an African American woman who began work for the ODRC in 1991 as a corrections officer at the Southeastern Correctional Institution ("SCI"). *First Am. Comp.*, ¶¶ 3, 11; *Deposition of April King*, Doc. 53 ("*King Depo.*"), p. 34.  In 1997, plaintiff's employment was terminated for allegedly exchanging telephone calls with a male parolee, in violation of Rule 46 of the ODRC Standards of Employee

3

Conduct. *Id.* at 34-37; *Brooks Depo.* Exh. 3, pp. 17-18. Following mediation, plaintiff's employment was reinstated in 1998. *King Depo.*, pp. 35-37. Instead of returning to SCI, plaintiff went to work as a corrections officer at the Corrections Medical Center ("CMC"). *Id.* at 37-38. Plaintiff worked at CMC until her May 4, 2004, termination which forms the subject of this litigation. *Id.; King Depo.* Exhibit A.

### C. Plaintiff's Prior Acquaintance With Carless Young

Plaintiff first met Carless Young when they were children and plaintiff's mother frequented a beauty salon owned by Mr. Young's father. *King Depo.*, p. 13; *Deposition of Carless M. Young*, Doc. 54, pp. 7-8 ("*Young Depo.*"). Plaintiff and Mr. Young did not attend school together and they did not see each other for many years after childhood. *King Depo.*, pp. 13-14; *Young Depo.*, pp. 8-9. In the early 1990s, plaintiff again saw Mr. Young "in passing" with Curtis King, her ex-husband. *King Depo.*, pp. 14, 18-19; *Young Depo.*, pp. 8-9. Plaintiff and Mr. Young were not friends,[4] but plaintiff considered him an "associate," someone to whom she would say hello in passing or with whom she would have a brief conversation. *King Depo.*, pp. 17-19. They were not romantically involved during this time. *Id.* at 17; *Young Depo.*, p. 12.

### D. Mr. Young's Incarceration at CMC

Mr. Young was incarcerated from approximately May 1993 until September 2003. *Young Depo.*, p. 6. Between February 18, 2000 and June 21, 2001, Mr. Young was incarcerated at CMC. *Id.* When plaintiff

---

[4]Plaintiff considers a "friend" to be "someone that I might share something personal with or I might go places with or have lunch with." *King Depo.*, pp. 18-19.

and Mr. Young first saw each other at CMC, they said a few passing words to each other. *King Depo.*, pp. 20-21; *Young Depo.*, p. 13. Prior to seeing him at CMC, plaintiff did not know that Mr. Young had been incarcerated. *King Depo.*, p. 19. Plaintiff told her supervisor that she knew Mr. Young. *Id.* at 16-17. Her supervisor advised her to submit an incident report. *Id.* Plaintiff complied, reporting that she knew Mr. Young as a child and that he knew her ex-husband. *Id.* at 17.

During Mr. Young's incarceration at CMC, plaintiff and Mr. Young discussed his job duties at the facility. *Id.* at 20; *Young Depo.*, pp. 13-15. In addition, Mr. Young once asked in passing how plaintiff's ex-husband was doing. *King Depo.*, p. 20; *Young Depo.*, p. 14. However, plaintiff and Mr. Young did not "catch up" on old times or otherwise have a personal relationship while he was incarcerated. *Id.* at 19-21; *Young Depo.*, pp. 12-15.

On June 6, 2001, Mr. Young was transferred from CMC to the Pickaway Correctional Institution ("PCI"). *Young Depo.*, p. 6. He was paroled from PCI on September 9, 2003. *Id.* For approximately six months after his release, Mr. Young worked at Buckeye Steel Castings in Columbus, Ohio. *Id.* at 20-22. On July 18, 2005, Mr. Young was released from parole. *Id.* at 56.


**E.     Notification of Alleged Relationship While Mr. Young Is On Parole**

On February 6, 2004, CMC Warden Tammy Hartzler contacted Defendant D.J. Norris, an investigator with ODRC's Security Threat Group Office, regarding allegations that Mr. Young, a parolee at the

time, was living with plaintiff at her residence at 1579 Morton Court in Galloway, Ohio. *Deposition of D.J. Norris*, Doc. No. 56, pp. 7-8, 15 ("*Norris Depo.*"); *Norris Depo.* Exhs. 10, 12-13; Exhibit 16, attached to *Deposition of Cary Sayers*, Doc. No. 55 ("*Sayers Depo.*"). On the same day, Defendant Norris contacted Mr. Young's parole officer, Mike Anderson, regarding a possible relationship between plaintiff and Mr. Young. *Norris Depo.*, p. 10; *Norris Depo.* Exhs. 10, 12-13. Defendant Norris advised that he would "be working this case." *Norris Depo.* Exhs. 10, 12-13.

### F.    Investigation on February 9, 2004

On February 9, 2004, Defendant Norris, Phillip Vermillion, Assistant Security Threat Group Investigation Coordinator, and Defendant Paul Arledge, Enforcement Unit Investigator, conducted surveillance on plaintiff's residence on Morton Court in Galloway, Ohio. *Norris Depo.*, p. 17; *Norris Depo.* Exhs. 10, 12-13; *Deposition of Phillip Vermillion*, Doc. No. 59, pp. 28-30 ("*Vermillion Depo.*"); *Deposition of Paul Arledge*, Doc. No. 58, pp. 11, 44-46 ("*Arledge Depo.*").[5] Specifically, they were on the alert for Mr. Young leaving plaintiff's residence. *Vermillion Depo.*, p. 26.

Surveillance began at approximately 6:00 a.m. *Norris Depo.*, p. 23; *Vermillion Depo.*, p. 29; *Norris Depo.* Exhs. 10, 12-13. Morton Court is a cul-de-sac with one entrance and one exit from Ricardo Drive. *King Depo.*, p. 89; *Vermillion Depo.*, p. 58; *Vermillion Depo.* Exhs. 2 and 3; *Sayers Depo.* Exh. 14. They drove around the Morton

---

[5]Tony Delgado, Security Threat Group Coordinator, also accompanied the surveillance group on February 9, 2004. *Norris Depo.*, p. 17. Mr. Delgado passed away on June 6, 2007. *Vermillion Depo.*, p. 7. Mr. Vermillion subsequently became Acting Security Threat Group Investigation Coordinator. *Id*. at 7-8.

Court cul-de-sac and passed by plaintiff's driveway. *Norris Depo.*, pp. 18-19. Plaintiff's garage door was open and there was one vehicle inside the garage. *Norris Depo.*, pp. 15-17; *Norris Depo.* Exhs. 10, 12-13; *Vermillion Depo.*, pp. 28-29. Defendant Norris observed and recorded the license plate number, "HATEEM2," on that vehicle.[6] *Norris Depo.*, pp. 15-19; *Norris Depo.* Exhs. 10, 12-13; *Arledge Depo.*, pp. 46-47. After observing the single vehicle in the garage, Defendant Norris concluded that they had missed Mr. Young that morning. *Norris Depo.*, p. 27. They left the area, planning to return to plaintiff's residence the next day. *Id.*; *Norris Depo.* Exhs. 10, 12-13.

**G.  Investigation on February 10, 2004**

In the early morning of February 10, 2004, plaintiff was at her residence preparing for a flight to Chicago. *King Depo.*, pp. 50-51. Plaintiff noticed a strange white vehicle in her cul-de-sac, but did not see who was driving the car. *Id.* at 51-58; *King Depo.* Exh. C. Plaintiff also received a call from her friend and neighbor, Vikki Williams, advising that two Caucasian men in a white vehicle had followed Ms. Williams from Ricardo Drive to Interstate 270. *King Depo.*, pp. 89-97; *King Depo.* Exh. F.

Defendant Norris, driving a green Cavalier, and Mr. Vermillion, driving a white Lumina, returned to the area of plaintiff's residence in the early morning of February 10, 2008. *Norris Depo.*, pp. 23, 32; *Vermillion Depo.*, pp. 36-37, 53; *Arledge Depo.*, pp. 14-15. Defendant

---

[6]Defendant Arledge testified that he "knew that day" that this license plate belonged to plaintiff. *Arledge Depo.*, p. 47. Documentation from a registration check of this license plate reflects that defendant Cary Sayers, CMC Investigator and Institutional Inspector, requested registration information of the license plate "HATEEM2" on February 10, 2004 at 11:07. *Vermillion Depo.*, pp. 96-98; *Vermillion Depo.* Exh. 8; *Arledge Depo.*, pp. 46-47; *Sayers Depo.*, pp. 6-7.

Arledge met Defendant Sayers at CMC that morning and the two drove together in one vehicle to plaintiff's residence. *Arledge Depo.*, p. 15; *Sayers Depo.*, pp. 7, 20.[7]

Prior to their arrival that morning, the surveillance team had learned information about Mr. Young. Defendants Norris, Arledge and Sayers had information that Mr. Young was driving a van.[8] *Norris Depo.*, pp. 26; *Norris Depo.* Exhs. 10, 12-13; *Arledge Depo.*, pp. 10-11, 48-49; *Sayers Depo.*, pp. 26-27. Mr. Vermillion had previously seen a photograph of Mr. Young when he was an inmate. *Vermillion Depo.*, pp. 46-47. Defendant Arledge had also seen a picture of Mr. Young or may have had the picture with him that morning. *Arledge Depo.*, p. 17. Defendant Sayers may have had a picture of Mr. Young that was taken when he was an inmate. *Sayers Depo.*, pp. 40-42.

Once he arrived, Defendant Norris parked in the Morton Court cul-de-sac across the street from and "a little bit north" of plaintiff's residence. *Norris Depo.*, p. 35. Mr. Vermillion parked on the south side of Ricardo Drive,[9] to the west of the entrance/exit of Morton Court (or, stated differently, on the left-side of Ricardo Drive, if facing Morton Court from Ricardo Drive). *Vermillion Depo.*, p. 53; *Vermillion Depo.* Exh. 2. Defendants Arledge and Sayers also parked on

---

[7]Defendants Norris, Arledge and Sayers and Mr. Vermillion, collectively, will be referred to as the "surveillance team" or "the officers."

[8]Defendant Norris prepared two written reports regarding the investigation. *Sayers Depo.*, pp. 9-10, 59-65; *Sayers Depo.* Exhs. 10 and 12. One of the reports is unsigned and contains some different information than the other report. *Id.* He has variously described this van as "white," "light-colored" and "white/grey." *Sayers Depo.*, pp. 46, 62; *Sayers Depo.* Exhs. 10 and 12.

[9]As discussed *supra*, Ricardo Drive is the street perpendicular to Morton Court, a cul-de-sac; the only entrance into, and the only exit from, Morton Court is from Ricardo Drive.

the south side of Ricardo Drive, but to the east of the Morton Court entrance/exit (or, stated differently, on the right-side of Ricardo Drive, if facing Morton Court from Ricardo Drive). *Arledge Depo.*, pp. 21-22; *Vermillion Depo.* Exh. 2. Any vehicle exiting Morton Court and turning east toward Defendants Arledge and Sayers would have first approached the rear of their vehicle. *Vermillion Depo.*, p. 57; *Arledge Depo.*, pp. 24-25.

The surveillance team used a feature on their Nextel cellular telephones to communicate with each other during the stakeout. *Norris Depo.*, pp. 47-48; *Vermillion Depo.*, pp. 42, 45, 47-50, 84; *Arledge Depo.*, pp. 28-29; *Arledge Depo.* Exhs. 18-19. This "talk group" feature -- much like walkie-talkies -- permitted the surveillance team to hear what a team member was saying. *Vermillion Depo.*, pp. 47-50, 84; *Arledge Depo.*, p. 29.[10]

While Defendants Arledge and Sayers were parked on Ricardo Drive that morning, a vehicle approached from behind and drove past them. *Arledge Depo.*, pp. 23-25; *Sayers Depo.*, pp. 51-52. Defendant Arledge could not see who was driving this vehicle, but they could read the letters on the license plate, "BLKDIVA." *Arledge Depo.*, pp. 25, 52-53; *Sayers Depo.*, p. 51. Defendants Arledge and Sayers knew that plaintiff had a vanity plate and suspected that the "BLKDIVA" vehicle may be related to plaintiff. *Arledge Depo.*, pp. 51-52, 54; *Sayers Depo.*, p. 61. Defendant Arledge used his Nextel telephone to request a check of "BLKDIVA." *Arledge Depo.*, pp. 31-32; *Arledge Depo.* Exh. 18; *Sayers Depo.*, pp. 48, 51-54. The vehicle was out of sight before

---

[10]However, Defendant Sayers did not have a Nextel telephone. *Sayers Depo.*, pp. 21-22, 47.

Defendant Arledge received the registration information four minutes later. *Arledge Depo.*, pp. 32, 52; *Sayers Depo.*, pp. 56-57.

Shortly after 6:00 a.m., Defendant Norris saw plaintiff's garage door open. *Norris Depo.*, p. 42; *Norris Depo*. Exhs. 10, 12-13. He observed two vehicles in the garage, a minivan and the car that he had seen the day before with the license plate "HATEEM2." *Norris Depo.*, pp. 37-38, 46-47. Using his Nextel telephone, Defendant Norris advised the other surveillance team members that the garage door had opened. *Id*. at 47-48; *Vermillion Depo.*, p. 73. A short while later, Defendant Norris observed a human silhouette, whom he believed to be an African-American male, entering the van and exiting the garage. *Norris Depo.*, pp. 37-46, 80-81. Defendant Norris notified the surveillance team that the van was pulling out of the garage and was moving from Morton Court toward Ricardo Drive. *Id*. at 47-48, 57; *Vermillion Depo.*, pp. 73-74; *Arledge Depo.*, pp. 37-39; *Sayers Depo.*, p. 71. Although Defendant Norris suspected that the person driving the van was Mr. Young, he could not definitively identify the individual. *Norris Depo.*, pp. 42, 45; *Norris Depo*. Exhs. 10, 12-13; *Arledge Depo.*, pp. 38, 53, 55. In addition, Defendant Norris did not positively identify the van as Mr. Young's van. *Norris Depo.*, p. 55.

Defendant Norris waited a short period of time before following the van so that the van's driver would not see that Defendant Norris was following him. *Norris Depo.*, pp. 57, 78. Defendant Norris lost sight of the van when it turned out of Morton Court. *Id*. at 78-79.

Mr. Vermillion saw a vehicle, but could not state that it was a van that exited the Morton Court area, *Vermillion Depo.*, pp. 104-06,

nor could he see the license plate or the color of the vehicle. *Id*.
at 76-77.

It had been decided in advance that Defendants Arledge and Sayers
would be primarily responsible for following a surveilled person from
the Morton Court area. *Vermillion Depo.*, pp. 55-56, 74-75; *Arledge
Depo.*, p. 55. As the van approached them from behind and drove past
on Ricardo Drive, Defendants Arledge and Sayers could not identify Mr.
Young as the driver of the van. *Arledge Depo.*, p. 43; *Sayers Depo.*,
pp. 35-36, 40, 74-75. Neither they, nor anyone else, ran a check of
the van's license plate at the time that the van was exiting the area.
*Norris Depo.*, pp. 47, 58-59; *Arledge Depo.*, pp. 50, 53, 55.
Defendants Arledge and Sayers began following the van without
attempting to conceal themselves. *Arledge Depo.*, pp. 41-43.
Defendant Arledge testified that he kept the van in his sight and
communicated with the surveillance team while following the van. *Id.*
at 59-62. Defendants Arledge and Sayers followed the van to Buckeye
Steel. *Arledge Depo.*, pp. 61-63.

Mr. Vermillion followed Defendants Arledge and Sayers, but was


unable to keep the van in his sight. *Id*. at 78-79, 104-06.

**H.    Interaction With Mr. Young at Buckeye Steel on February 10,
2004**

Defendant Norris and Mr. Vermillion joined Defendants Arledge and
Sayers who were already in the Buckeye Steel parking lot. *Norris

11

*Depo.*, p. 25; *Arledge Depo.*, pp. 62-63.[11]  No one had positively
identified Mr. Young, who was also present, prior to their arrival at
Buckeye Steel.  *Vermillion Depo.*, pp. 93, 104; *Sayers Depo.*, p. 36;
*Sayers Depo.* Exh. 14; *Young Depo.*, pp. 42-44.

As Mr. Young exited his van, a 1991 blue Dodge Caravan, one of
the members of the surveillance team called his name.  *Young Depo.*,
pp. 43-44, 50.  Mr. Young responded and the surveillance team members
identified themselves as officers.  *Id*. at 44-45.  One of them
asked Mr. Young where he had been prior to arriving at Buckeye Steel.
*Id*. at 44-45; *Sayers Depo.* Exh. 14.  Mr. Young responded that he had
come from 240 Glenkirk and that he had stopped for gas on Livingston
Avenue.  *Young Depo.*, p. 45; *Sayers Depo.* Exh. 14.  The surveillance
team disputed Mr. Young's response, telling him that they had followed
him from plaintiff's residence on Morton Court.  *Young Depo.*, pp. 45-
46; *Sayers Depo.* Exh. 14; *Norris Depo.* Exhs. 10, 12-13.  Plaintiff
denied their allegation, insisting that he had come from Glenkirk.
*Id*.  The surveillance team believed that Mr. Young was uncooperative
in response to their questions.  *Sayers Depo.*, p. 35; *Sayers Depo.*
Exh. 14; *Norris Depo.* Exhs. 10, 12-13.

At some point during this exchange, Mr. Young was patted down,
handcuffed and his van was searched.  *Young Depo.*, pp. 46-48;
*Vermillion Depo.*, p. 95.  Nothing was found in Mr. Young's van and he
was eventually uncuffed and released.  *Young Depo.*, pp. 48; *Vermillion
Depo.*, p. 95; *Norris Depo.* Exhs. 10, 12-13.  Mr. Young was told to

---

[11]According to Defendant Arledge, the surveillance team did not pre-arrange to
meet at Buckeye Steel on February 10, 2004.  *Arledge Depo.*, p. 63.  As will be
discussed *infra*, plaintiff and Mr. Young dispute this account.

report to his parole officer immediately.  *Young Depo.*, p.  52.  Mr.
Young complied.  *Id*. at 52-53.  Mr. Young denied having any contact
with plaintiff that morning.  *Id*. at 52-54.

**I.    License Plate Check**

Subsequently, Defendant Sayers checked the van's license plate;
the registration information revealed that Mr. Young was the owner of
a van.  *Vermillion Depo.*, pp. 96-99; *Vermillion Depo*. Exh. 9.

**J.    Plaintiff's Interview with Defendant Sayers**

On February 18, 2004, Defendant Sayers interviewed plaintiff in
the presence of Roxie Turner, a corrections officer and union
representative.  *King Depo.* Exh. D, pp. 12-16.  Plaintiff confirmed
that her vehicle had the license plate "HATEEM2."  *Id*. at 15.
Plaintiff denied that Mr. Young left from her residence on February
10, 2004.  *Id*. at 13-14.  Plaintiff contended that it was her
neighbor, Ms. Williams, whom officers followed from Morton Court to
Interstate 270 on the early morning of February 10, 2004; Defendant
Sayers denied that contention.  *Id*. at 12-15.

**K.    Plaintiff's Pre-Disciplinary Hearing and Termination**

On March 24, 2004, Hearing Officer Defendant Bill Blaney
conducted a pre-disciplinary hearing.  *King Depo.* Exh. G.  Plaintiff,
Ms. Turner and Defendant Sayers were present.  *Id*.  Plaintiff was
informed of the charges against her.  *Id*.  Plaintiff denied that she
had violated any rules by having an unauthorized relationship with Mr.
Young.  *Id*. at 4-5.[12]  Plaintiff pointed to discrepancies in the

---

[12]plaintiff acknowledged that she had previously received a copy of these rules.
*King Depo.*, pp. 136-37; *King Depo*. Exh. I.

investigation.  *Id*.  She also argued that Willie Robinson, plaintiff's ex-boyfriend, had previously alleged an improper relationship and had falsified evidence against her.  *Id.; King Depo.*, pp. 64-65.

Mr. Vermillion and Defendants Norris and Arledge were contacted to clarify some of plaintiff's allegations and the surveillance on February 10, 2004.  *King Depo.* Exh. G, p. 6.  Plaintiff disputes their testimony and Defendant Blaney agreed that "there are some inconsistencies noted regarding details peripheral to management's investigation[.]" *King Depo.*, pp. 127-32; *King Depo.* Exh. G, p. 7. However, Defendant Blaney concluded that just cause existed to discipline plaintiff for an unauthorized relationship with Mr. Young in violation of Rule 46(B).  *King Depo.* Exh. G, p. 7.[13]

On April 21, 2004, Warden Hartzler terminated plaintiff effective May 4, 2004, for violating Rule 46(B).[14]  *King Depo.*, pp. 135-36; *King Depo.* Exhs. A, B.  Plaintiff was advised of her right to file a grievance.  *King Depo.* Exh. A.

**L.    Plaintiff's Grievance**

On approximately May 6, 2004, Ms. Turner, plaintiff's union representative, filed a grievance on plaintiff's behalf, alleging that plaintiff had been improperly removed from her job.  *King Depo.*, pp. 141-42; *King Depo.* Exh. K.  On June 16, 2004, ODRC denied the grievance because "[t]he facts reveal the grievant [plaintiff] engaged

---

[13]Defendant Blaney also concluded that just cause did not exist for disciplining plaintiff for violating Rule 46(D), which prohibits "[r]esiding with any individual currently or previously under the supervision of the Department without express authorization of the Department." *Id.*

[14]As previously noted, Rule 46(B) prohibits "any other unauthorized personal or business relationship(s) with any individual currently or formerly under the supervision of the Department or friends or family of same." *King Depo.*, Exh. H, at 18.

in an unauthorized personal or business relationship with an individual currently under the supervision of the Department. There is clearly just cause for removal." *King Depo.* Exh. L; *King Depo.*, p. 142.

### M.   Arbitration

On January 13 and 20, 2005, plaintiff, through union representatives, participated in an arbitration hearing at which both plaintiff and defendants presented witnesses. *King Depo.*, pp. 142-44; *King Depo.* Exh. M.  On approximately April 11, 2005, the arbitrator, defendant David M. Pincus, upheld the denial of plaintiff's grievance, concluding that ODRC had just cause to remove her. *King Depo.* Exh. M.

### N.   Charge of Discrimination

On February 23, 2005, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *King Depo.*, pp. 145-48; *King Depo.* Exhs. N, O.  On July 28, 2005, the EEOC issued to plaintiff a right to sue notice. *King Depo.*, pp. 147-49; *King Depo.* Exh. P.

### O.   Instant Litigation

Plaintiff filed the original *Complaint*, Doc. No. 1, on October 21, 2005.  The *First Amended Complaint* was filed on October 25, 2005. On February 2, 2006, *Defendants' Motion to Dismiss*, Doc. No. 9 ("*Motion to Dismiss*"), was filed, requesting dismissal of Counts One and Eight of the *First Amended Complaint*.  On September 15, 2006, the Court dismissed Count One in its entirety and dismissed a portion of Count Eight.  *Opinion and Order*, Doc. No. 28.  The claims remaining

for resolution in this action are as follows:[15]

| | |
|---|---|
| Count Three: | disparate impact claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.; |
| Count Four: | disparate treatment claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.; |
| Counts Five and Six: | Section 1983 claims challenging Rule 46 and Standards of Employee Conduct as unconstitutionally vague; |
| Count Seven: | Section 1983 claim challenging Rule 46 and the Standards of Employee Conduct as unconstitutionally overbroad; and |
| Count Eight: | Section 1983 claim challenging Rule 46 and the Standards of Employee Conduct as violative of the right to freedom of association and privacy (as to the individual defendants in their official capacities). |

*First Am. Comp.; Opinion and Order*, p. 16.

### P.   Plaintiff Marries Mr. Young

Plaintiff married Mr. Young on July 28, 2006.  *King Depo.*, pp. 10-11; *Young Depo.*, p. 7.


## II.   STANDARD

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which  provides in pertinent part:

> The judgment sought shall be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no

---

[15]As noted *supra*, plaintiff voluntarily dismissed with prejudice her claim under 42 U.S.C. §1985, Count Two of the *First Amended Complaint*.  *See Plaintiff's Memorandum Contra Defendant's* [sic] *Motion to Dismiss*, Doc. No. 14, p. 2.  *See also Opinion and Order*, Doc. No. 28, p. 3.

> genuine issue as to any material fact and that
> the movant is entitled to judgment as a matter of
> law.

Fed. R. Civ. P. 56(c)(2007). Pursuant to Rule 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact . . . ." *Id.* In making this determination, the evidence "must be viewed in the light most favorable" to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). "Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a

17

metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III. DEFENDANT DAVID M. PINCUS

As discussed *supra*, plaintiff filed the original *Complaint* on October 21, 2005. On October 20, 2005, waiver of service of summons was filed as to all defendants except Defendant Pincus. *See* Doc. No. 3. The *First Amended Complaint* was filed on October 25, 2005. Plaintiff was notified on February 2, 2006 that "Defendant Pincus is not an employee of DRC, and to Defendants' knowledge, Pincus has yet to be served with process in this case." *Motion to Dismiss*, Doc. No. 9, p. 1 n.1. Despite this alert from defendants, plaintiff did not attempt to perfect service. Subsequently, defendants filed the *Motion for Summary Judgment*, stating that "Pincus is not a DRC employee, service on him has not been effectuated and undersigned counsel does not represent him in this matter." *Motion for Summary Judgment*, p. 2. Again, plaintiff has not addressed this allegation or attempted to demonstrate that perfect service has been effected as to this defendant.

Rule 4(m) of the Federal Rules of Civil Procedure requires that a defendant be served within 120 days after the complaint is filed. Fed. R. Civ. P. 4(m). After notice to the plaintiff, the court "must dismiss the action without prejudice against the defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for

service for an appropriate period." *Id*. Therefore, a plaintiff must receive notice before dismissing claims against a defendant not served with process within the period established by Rule 4(m), but a plaintiff must establish good cause for failure to perfect service in order to avoid dismissal. *Id*. *See also Reynosa v. Schultz*, No. 07-1521, 282 Fed. Appx. 386, at 393 n.5 (6th Cir. June 23, 2008).

A finding of good cause for an extension of time in which to serve a defendant is a matter of discretion entrusted to the district court. *Friedman v. Estate of Presser*, 929 F.2d 1151, 1157 (6th Cir. 1991). Establishing good cause requires a showing of "at least excusable neglect." *Stafford v. Franklin County*, No. 2:04-cv-178, 2005 U.S. Dist. LEXIS 12740, at *8 (citing *Stewart v. TVA*, No. 99-5723, 2000 U.S. App. LEXIS 29904, at *3 (6th Cir. Nov. 21, 2000) and *Moncrief v. Stone*, 961 F.2d 595, 597 (6th Cir. 1992)). Inadvertence on the part of counsel or "half-hearted efforts to serve a defendant within the statutory period does not constitute good cause." *Friedman*, 929 F.2d at 1157.

Accordingly, this *Opinion and Order* shall constitute notice to plaintiff that the Court will dismiss all claims against Defendant David M. Pincus after twenty-one (21) days of the date of this *Opinion and Order* unless plaintiff establishes that service of process has been timely made or establishes good cause for the failure to timely effect service of process on this defendant.

IV. **DISPARATE TREATMENT UNDER TITLE VII (COUNT FOUR)**

A. **Standard**

Plaintiff alleges that she was terminated because of her race

(African-American) and her sex. *First Am. Comp.*, ¶¶ 68-73. Title VII
makes it unlawful for an employer "to discharge any individual, or
otherwise to discriminate against any individual with respect to
compensation, terms, conditions, or privileges of employment, because
of such individual's race, color, religion, sex, or national origin. .
. ." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a *prima
facie* case of discrimination either by presenting direct evidence of
intentional discrimination by the defendant, . . . or by showing the
existence of circumstantial evidence which creates an inference of
discrimination[.]" *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241,
1246 (6th Cir. 1995) (citations omitted).

Plaintiff does not allege direct evidence of discrimination, but
instead relies on circumstantial evidence. *Plaintiff's Memoranda
Contra to Defendant's* [sic] *Motion for Summary Judgment or, in the
Alternative for Qualified Immunity, of Defendants State of Ohio,
Reginald Wilkinson, Terry Collins, Paul Arledge, Cary Sayers, D.J.
Norris & William Blaney*, Doc. No. 67 ("*Memo. Contra*"), pp. 19-20.
Where the plaintiff relies on circumstantial evidence, the Court
analyzes claims under the burden-shifting framework set forth in
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in
*Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981).

Under the *McDonnell Douglas* framework, a plaintiff must first
establish a *prima facie* case of discrimination by demonstrating that:
(1) she was a member of a protected class; (2) she was subject to an
adverse employment action; (3) she was qualified for the job; and (4)
for the same or similar conduct, she was treated differently from

20

similarly situated non-protected employees. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 252-56; *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

Once the plaintiff has met this initial burden, the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the" adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant employer satisfies its burden, the plaintiff must then show not only that defendant's articulated reason was a pretext, but that the real reason was unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The ultimate burden of persuasion remains throughout this burden-shifting analysis on the plaintiff. *See Burdine*, 450 U.S. at 253.

### B.  *Prima Facie* Case: Similarly Situated Employees

Defendants do not dispute that plaintiff meets the first three elements of her *prima facie* case. Plaintiff is an African-American female; she was qualified for her position; and she was subjected to an adverse employment action. However, defendants contend that plaintiff cannot meet the fourth element of her *prima facie* case, which requires evidence that the defendant treated plaintiff differently than other similarly situated employees. *Motion for Summary Judgment*, pp. 12-14.

"It is the plaintiff's burden to establish that a similarly situated person outside the protected class was treated more favorably than [she]." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728-29 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th

Cir. 1992)).  To be "similarly situated" in the disciplinary context, a plaintiff must show that the non-protected employee with whom she seeks to compare herself is similar, that is "nearly identical," in all relevant aspects.  *Id.* (quoting *Mitchell*, 964 F.2d at 583 and *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  Thus, "similarly situated" individuals "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell*, 964 F.2d at 583.

Plaintiff alleges that she was treated more harshly than seven similarly situated employees.  *First Am. Comp.*, ¶ 43; *Memo. Contra*, pp. 21-28.  The Court will address each employee in turn.

### 1.  Cynthia Neff

Defendants argue that Cynthia Neff, a Caucasian serving as "Account Clerk 2," is not similarly situated because (1) Ms. Neff held a different position than plaintiff, who was a corrections officer; (2) Ms. Neff's offense, *i.e.,* typing a letter for an inmate and mailing it to the inmate's family, is less serious than plaintiff's offense, *i.e.,* engaging in a personal relationship with a parolee; and (3) Ms. Neff was disciplined by Warden Rodney L. Francis, while it was Warden Hartzler who disciplined plaintiff.  *Motion for Summary Judgment*, p. 13 (citing *King Depo.*, p. 161 and *King Depo.* Exh. R, pp. 101, 195-96[16]); *Reply Memorandum of Defendants State of Ohio, Reginald Wilkinson, Terry Collins, Paul Arledge, Cary Sayers, D.J. Norris &*

---

[16]The page numbers referenced in *King Depo.* Exh. R are the bates-numbers that appear on the bottom of each page.

*William Blaney in Support of Their motion for Summary Judgment or, in the Alternative for Qualified Immunity*, Doc. No. 70 ("*Reply*"), pp. 3-4.[17]

Plaintiff contends that the similarly situated standard is not inflexible and that she need not demonstrate an "exact correlation" with another employee in order to be similarly situated. *Memo. Contra*, p. 23. Plaintiff argues that Ms. Neff's offense was as serious as plaintiff's offense and violated Rule 46. *Id*.

Ms. Neff's classification title is "Account Clerk 2." *King Depo.* Exh. R, p. 195. The parties do not provide a list of the duties of this job, but the job title suggests administrative accounting duties. Conversely, a corrections officer is entrusted with the "care, custody and control over" incarcerated individuals. *Brooks Depo.*, p. 34. There is no evidence that an account clerk and corrections officer share the same duties.[18] Accordingly, the Court concludes that Ms. Neff is not similarly situated to plaintiff.

### 2. Joe LeMaster

Defendants argue that Joe LeMaster, a Caucasian corrections officer who harbored a fugitive cousin in his home, is not similarly situated to plaintiff because (1) Mr. LeMaster was disciplined by Warden Betty Mitchell while it was Warden Hartzler who disciplined plaintiff; (2) Mr. LeMaster worked at Mansfield Correctional Institution, a different facility than where plaintiff worked; and (3)

---

[17]Ms. Neff was fined two days for her infraction. *King Depo.* Exh. R, p. 195.

[18]Indeed, common knowledge and experience suggest that an account clerk serves a different function than does a corrections officer.

Mr. LeMaster was charged with violating Rules 7[19] and 46(D),[20] while plaintiff allegedly violated Rule 46(B).  *Motion for Summary Judgment*, pp. 13-14; *First Am. Comp.*, ¶ 43; *King Depo.* Exh. R, p. 192.

Plaintiff contends that Mr. LeMaster and other "comparables" are similarly situated even though they were charged with violating different rules.  *Memo. Contra*, pp. 23-24.  Plaintiff further argues that "[t]his Court should not base its decision on whether Ms. King's comparables are similarly situated merely on the basis of where the employee worked and who disciplined the employee" because the "compartmentalization" of ODRC "enhances and encourages the subjective nature of imposing different discipline for similarly situated employees in different institutions and allows discrimination to occur."  *Id.* at 24-25.  Plaintiff contends that statistical evidence "establishes that there is discrimination against women in the enforcement of Rule 46."  *Id.* at 25.

It is true that "the requirement that a plaintiff and her comparator 'must have dealt with the same supervisor' to be considered similarly situated does not automatically apply in every employment discrimination case.  Whether that criterion is relevant depends upon the facts and circumstances of each individual case."  *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (stating that it would have been appropriate for the district court to instruct the jury that a

---

[19]According to the rules that were in effect on October 1, 2001, Rule 7 punishes "[f]ailure to follow post orders, administrative regulations, policies or directives." *Brooks Depo.* Exh. 3, p. 13.

[20]According to the rules that were in effect on October 1, 2001, Rule 46(D) prohibits "[r]esiding with any individual currently or previously under the supervision of the Department without express authorization of the Department." *Brooks Depo.* Exh. 3, p. 18.

plaintiff and comparator "must have dealt with the same ultimate decision-maker, rather than the same supervisor"). Indeed, the Sixth Circuit has found that employees with different supervisors were similarly situated where all of the people involved in the decision-making process "were well-aware of the discipline meted out to past violators[.]" *Seay v. TVA*, 339 F.3d 454, 480 (6th Cir. 2003).

Moreover, "[a]lthough a change in managers is not a defense to claims of race or sex discrimination, it can suggest a basis other than race or sex for the difference in treatment received by two employees." *Cooper v. City of N. Olmsted,* 795 F.2d 1265, 1271 (6th Cir. 1986). *See also Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("Differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination.") (citations omitted).

In this case, it was Warden Hartzler who disciplined plaintiff; Mr. LeMaster was disciplined by Warden Mitchell. Unlike in *Seay*, there is no evidence before the Court to suggest that these different wardens were aware of which particular discipline -- among the range of discipline authorized by the Rule and Standards of Employee Conduct -- had been meted out to different employees at the various Ohio correctional facilities. Under these circumstances, the Court concludes that the existence of different decision makers is relevant because they were not part of the same decision-making process, a fact suggesting a basis other than race or sex for the difference in treatment. *See McMillan*, 405 F.3d at 414; *Cooper,* 795 F.2d at 1271. *See also Walker v. Ohio Dep't of Rehab. and Correction*, No. 06-3900, 241 Fed. Appx. 261, 266-67 (6th Cir. July 11, 2007) (agreeing that

"where the court is asked to compare impositions of discretionary discipline in response to fact-specific abuses of authority, the identity of the supervisor is surely a relevant consideration").

Second, plaintiff was terminated in May 2004, *i.e.,* more than four years after Mr. LeMaster had been disciplined in February 2000. *King Depo.* Exhs. A and R, p. 192. *See Tribble v. Memphis City Sch.*, No. 05-6166, 193 Fed. Appx. 401, 407 (6th Cir. Aug. 21, 2006) (finding that plaintiff and alleged comparable were not similarly situated where the alleged comparable's behavior "took place during a different time frame, in a different school, with a different principal, and under a different [Director of Army Instruction]"); *Bertram v. Medina County*, No. 1:07-cv-02460, 2008 U.S. Dist. LEXIS 29157, at *17 (N.D. Ohio April 9, 2008) (finding that individuals were not similarly situated where, *inter alia,* five years separated the incidents involving plaintiff and the alleged comparable). Significantly, it is not clear that the same rules and policies were in effect in 2000, when Mr. LeMaster was disciplined, and in May 2004, when plaintiff's employment was terminated. *Brooks Depo.*, pp. 21-24; *Brooks Depo.* Exh. 3 (policy effective October 1, 2001, through October 16, 2004).

Third, plaintiff contends that the Court should disregard the fact that plaintiff and Mr. LeMaster were charged with violating different rules. *Memo. Contra*, pp. 23-24. Plaintiff opines, without any supporting authority, that Mr. LeMaster's misconduct is "more serious than" plaintiff's conduct and therefore really a violation of the same rule. *Id*. at 23-28. As an initial matter, plaintiff cannot rely on a subjective, unverified belief as to the severity of Mr. LeMaster's conduct to establish her *prima facie* case. *See Foreman v.*

26

*Farmer Jack Grocery Stores*, No. 96-1280, 1997 U.S. App. LEXIS 5675, at
*4 (6th Cir. Mar. 21, 1997).  In addition, it would be improper for
this Court to engage in management and disciplinary decisions best
left to the employer.  *See Smith v. Leggett Wire Co.*, 220 F.3d 752,
763 (6th Cir. 2000).  *See also Hedrick v. W. Reserve Care Sys.*, 355
F.3d 444, 462 (6th Cir. 2004) (citing, *inter alia*, *Simms v. Oklahoma
ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d
1321, 1330 (10th Cir. 1999) (stating that courts should not act as a
"super personnel department")).

Finally, plaintiff's and Mr. LeMaster's different workplaces
suggest that plaintiff and Mr. LeMaster are not similarly situated.
*See*, *e.g.*, *Tribble*, 193 Fed. Appx. 401 at 407.  Plaintiff argues that
the Court should disregard this difference.  *Memo. Contra*, pp. 24-25.
In making this argument, plaintiff refers to statistical evidence that
"establishes that there is discrimination against *women* in the
enforcement of Rule 46."  *Memo. Contra*, p. 25.[21]

A "disparate treatment claim obligates the plaintiff to show
discriminatory intent or motive for a *particular* adverse employment
decision."  *Huguley v. GMC*, 52 F.3d 1364, 1371 (6th Cir. 1995)
(emphasis in original).  Therefore, "statistical evidence can be used
if it assists in proving direct *individual* discrimination" and
"show[s] *individualized* discriminatory treatment, rather than just a
general discriminatory effect as would need to be shown in a disparate

---

[21]The Court notes that statistical evidence is considered to be *direct* evidence
of discrimination.  *See*, *e.g.*, *Hilbert v. Ohio Dep't of Rehab. and Corr.*, No. 03-4385,
121 Fed. Appx. 104, 109-10 (6th Cir. Feb. 4, 2005).  As noted *supra*, plaintiff
specifically disavows direct evidence of discrimination.  *Memo. Contra*, pp. 19-20.

impact case." *Hilbert*, 121 Fed. Appx. at 109-10 (citing *Huguley*, 52 F.3d at 1370-72) (emphasis added). The statistical evidence referred to by plaintiff fails to establish the individualized discriminatory treatment necessary to plaintiff's disparate treatment claim and fails to "eliminate the most common nondiscriminatory explanations for the disparity." *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1975); *Hilbert*, 121 Fed. Appx. at 110. There are simply too many differences between plaintiff and Mr. LeMaster, discussed *supra*, to conclude that the individual discipline imposed upon them was a function of discrimination. Accordingly, the Court concludes that Mr. LeMaster is not similarly situated to plaintiff in all relevant respects.

### 3. Donald Lucas

Defendants argue that Donald Lucas, a Caucasian corrections officer, is not similarly situated to plaintiff because (1) Mr. Lucas was disciplined by Warden Margaret Bagley while it was Warden Hartzler who disciplined plaintiff; and (2) Mr. Lucas worked at the Mansfield Correctional Institution, a different facility than where plaintiff worked. In any event, Mr. Lucas, who was also charged with violating Rule 46(B), was also removed from employment, as was plaintiff. *Motion for Summary Judgment*, pp. 13-14; *First Am. Comp.*, ¶ 43; *King Depo.* Exh. R, p. 193. Defendants acknowledge that Mr. Lucas was eventually reinstated, but contend that the reinstatement, ordered by an arbitrator, cannot be used to establish disparate treatment. *Motion for Summary Judgment*, p. 14.

Plaintiff applies the same arguments to Mr. Lucas that she

applied to Mr. LeMaster, *Memo. Contra*, pp. 23-28, and plaintiff's arguments in that regard fail for many of the reasons discussed *supra*. First, the fact that different decision-makers imposed discipline on plaintiff and Mr. Lucas is relevant because there is no evidence that plaintiff's supervisor was aware of the discipline imposed on Mr. Lucas. Second, the different workplaces also distinguish plaintiff from Mr. Lucas. Third, Mr. Lucas, like Mr. LeMaster, was disciplined in 2000, four years prior to plaintiff's termination. *King Depo.* Exh. R, p. 193; *Brooks Depo.* Exh. 3. Fourth, Mr. Lucas was charged with the same rule violation as was plaintiff and was removed from his position as was plaintiff. His eventual reinstatement at the direction of an arbitrator does not establish unlawful discrimination. *See*, *e.g.*, *Walker v. Ohio Dep't of Rehab. & Corr.*, No. 06-3900, 241 Fed. Appx. 261, 269 (6th Cir. July 11, 2007). Finally, plaintiff's statistical evidence fails to establish individualized discriminatory treatment. Accordingly, the Court concludes that Mr. Lucas is not a valid comparator to plaintiff.

### 4. Ted Scherer

Plaintiff's characterization of Ted Scherer as a comparator must likewise fail. Mr. Scherer, a Caucasian corrections officer, made unauthorized telephone calls for two inmates and gave donuts to inmates. *First Am. Comp.*, ¶ 43; *King Depo.* Exh. R, p. 194. Mr. Scherer was disciplined by a different decision-maker, Warden Bagley, than was plaintiff. *King Depo.* Exh. R, p. 194. Moreover, Mr. Scherer worked in a different corrections facility, Mansfield Correctional Institution, than did plaintiff. *Id.* Mr. Scherer was disciplined in

June 2001, nearly three years before plaintiff was disciplined. *Id.*; *Brooks Depo.*, pp. 21-24; *Brooks Depo.* Exh. 3. Mr. Scherer was also charged with violating different rules, *i.e.,* Rules 8[22] and 45(B),[23] than has plaintiff. *King Depo.* Exh. R, p. 194. For the reasons discussed *supra*, the Court rejects plaintiff's contention that Mr. Scherer's infractions "would be better characterized as a violation of Rule 46(A)." *Memo. Contra*, p. 24. Accordingly, the Court concludes that Mr. Scherer was not similarly situated to plaintiff.

### 5. Erika Faulkner

Ms. Faulkner, a Caucasian corrections officer, permitted an inmate to braid her hair. *First Am. Comp.*, ¶ 43; *King Depo.* Exh. R, p. 197. Ms. Faulkner was disciplined by a different decision-maker, Warden Bagley, than was plaintiff, *King Depo.* Exh. R, p. 197, and worked in a different corrections facility, Mansfield Correctional Institution, than did plaintiff. *Id.* Ms. Faulkner was also charged with violating a different rule, *i.e.,* Rule 8, than was plaintiff. *King Depo.* Exh. R, p. 197. Plaintiff's personal opinion that "[g]iving favors or preferential treatment to select inmates would be a high threat to prison safety," *Memo. Contra*, p. 26, is insufficient to establish that Ms. Faulkner's violation is comparable to plaintiff's violation. The Court concludes that, under these circumstances, Ms. Faulkner is not a valid comparator to plaintiff.

---

[22]According to the October 1, 2001 rules, Rule 8 punishes the "[f]ailure to carry out a work assignment or the exercise of poor judgement in carrying out an assignment." *King Depo.* Exh. H, p. 16.

[23]According to the October 1, 2001 rules, Rule 45(B) forbids "[w]ithout express authorization, giving preferential treatment to any individual under the supervision of the Department, to include but not limited to. . . [t]he offering, receiving, or giving of anything of value." *King Depo.* Exh. H, p. 18.

### 6. James Coffer

James Coffer, a Caucasian safety and health coordinator, conveyed contraband to an inmate for which he was fined. *Memo. Contra*, pp. 22, 26-27. Mr. Coffer is not similarly situated to plaintiff. The two held different job positions and worked in different corrections facilities. *Zickar Depo*. Exh. C, p. 32. There is no evidence that the same decision-maker disciplined the two. Accordingly, the Court concludes that plaintiff is not similarly situated in all relevant respects to Mr. Coffer.

### 7. John Coy

The Court also rejects plaintiff's argument that John Coy, a Caucasian corrections officer who telephoned an inmate's daughter and who was fined as a result, is similarly situated to plaintiff. *Memo. Contra*, pp. 22, 26-27. Mr. Coy worked in a different corrections facility, Pickaway Correctional Institution, than did plaintiff. *Zickar Depo*. Exh. C, p. 61. He was charged in 2002 with violating a different rule than was plaintiff. *Zickar Depo.* Exh. C, p. 61. There is no evidence that the same decision-maker disciplined both plaintiff and Mr. Coy. The Court concludes that Mr. Coy is not a valid comparator to plaintiff.

Because plaintiff cannot show that a similarly situated employee was treated more favorably than she, the Court concludes that plaintiff has failed to establish a *prima facie* case of race or sex discrimination. *See*, *e.g.*, *McDonnell Douglas*, 411 U.S. at 802 (1973); *Burdine*, 450 U.S. at 252-56. Accordingly, plaintiff's disparate treatment claims must fail. *See*, *e.g.*, *Mitchell*, 964 F.2d at 582-84;

*Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir. 2004)

("[T]he district court correctly held that because [plaintiff] failed

to establish a *prima facie* case of discrimination, [defendant] was

entitled to summary judgment on the Title VII and R.C. § 4112.02

claims."); *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 233 (6th

Cir. 1983)("Failure to establish a *prima facie* case by a preponderance

of the evidence mandates dismissal of the claim."). Therefore, as to

Count Four of the *First Amended Complaint*, defendants' *Motion for

Summary Judgment* is **GRANTED**.

## V.  DISPARATE IMPACT UNDER TITLE VII (COUNT THREE)

### A.  Implicit Motion for Leave to Amend

The *First Amended Complaint* alleges that enforcement of Rule 46

of the ODRC's Standards of Employee Conduct disparately impacts

African-American employees. *First Am. Comp.*, ¶¶ 62-67. The *First

Amended Complaint* does not allege that Rule 46 has a disparate impact

on women. *Id.* However, in opposing the *Motion for Summary Judgment*,

plaintiff argues that Rule 46 has an adverse impact on women, not

African-Americans. *Memo. Contra*, pp. 25, 33-41. Because plaintiff

has not previously pleaded a claim for disparate impact upon women,

the Court will treat plaintiff's argument as an implicit motion for

leave to amend the *First Amended Complaint*. *See*, *e.g.*, *Niemi v. NHK

Spring Co.*, 543 F.3d 294, 307 (6th Cir. 2008).

Defendants do not contend that plaintiff's implicit motion to

amend the *First Amended Complaint* should be denied. Instead,

defendants observe that plaintiff has apparently abandoned her

original disparate impact claim based on race. *Reply*, p. 15, and

argue that plaintiff's disparate impact claim based on sex is without merit. *Id.* at 15-21; *Motion for Summary Judgment*, pp. 18-22.

Leave to amend should be freely granted when justice so requires. Fed. R. Civ. P. 15(a)(2). Permitting this amendment will not prejudice defendants because defendants anticipated and briefed the proposed amended disparate impact claim. Accordingly, plaintiff's implicit motion to amend the *First Amended Complaint* is **GRANTED.** The Court will consider plaintiff's disparate impact claim (Count Three) to allege a disparate impact upon women.

**B. Standard**

Under Title VII, "[d]iscrimination occurs when an employer 'uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . .'" *Dunlap v. TVA*, 519 F.3d 626, 629 (6th Cir. 2008) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).

A plaintiff need not prove discriminatory intent to succeed on a claim for disparate impact. *Id.* Instead, the plaintiff must establish that "a facially neutral employment practice falls more harshly on one group than another and that the practice is not justified by business necessity." *Id.* (citing *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92 (6th Cir. 1982)). Courts employ a three-part burden-shifting analysis to determine whether an unlawful disparate impact exists in a particular case. *Id.* First, a plaintiff must establish a *prima facie* case by:

(1) identifying a specific employment practice to be challenged; and (2) proving through relevant statistical analysis that the challenged practice has an adverse impact on a protected group. *Johnson v. United States Dep't of Health & Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994).

In analyzing a plaintiff's statistics, courts do not apply "rigid mathematical formulas[.]" *Scales v. J.C. Bradford and Co.*, 925 F.2d 901, 908 (6th Cir. 1991). Therefore, in order to prevail on her claim, a plaintiff is not required to eliminate all other variables. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 406 (6th Cir. 1999); *United States v. City of Warren*, 138 F.3d 1083, 1094 (6th Cir. 1998). "A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence." *Bazemore v. Friday*, 478 U.S. 385, 404 (1986). The court must determine whether the statistics are sufficient based on the "entire evidence" in the record. *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364 (1948) (internal quotation marks omitted)). *See also Phillips v. Cohen*, 400 F.3d 388, 401 (6th Cir. 2005) ("[E]xpert statistical analysis in disparate impact cases is not to be considered in a vacuum, as the only evidence permitting plaintiffs to meet their prima facie case; it must be considered 'in light of all the evidence in the record.'") (quoting *Bazemore*, 478 U.S. at 401).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendants to "articulate a legitimate business reason for the employment practice." *Kovacevich v. Kent State Univ.*, 224

F.3d 806, 830 (6th Cir. 2000). *See also Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005) (stating that a defendant must "show that the protocol in question has a 'manifest relationship to the employment'– the so-called 'business justification'") (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)). If the defendants succeed, the burden thereupon shifts back to the plaintiff "to show either that the employer's reason is pretext for discrimination, or that there exists an alternative employment practice that would achieve the same business ends with a less discriminatory impact." *Kovacevich*, 224 F.3d at 830.

### C.   *Prima Facie* Case

Plaintiff identifies Rule 46 as the "specific employment practice" that has a disparate impact upon female employees. *First Am. Comp.*, ¶¶ 62-67. In attempting to meet the second prong of her *prima facie* case, plaintiff relies on the findings of Michael J. Zickar, Ph.D., a professor of psychology at Bowling Green State University, *Deposition of Michael J. Zicker, Ph.D.,* p.10, Doc. No. 57 ("*Zickar Depo.*"), who used a statistical analysis program, Statistical Package for the Social Sciences ("SPSS"), to analyze 305 instances between 2000 to 2007 in which ODRC employees were disciplined for having unauthorized relationships. *Zickar Depo.*, pp. 26-27; *Zickar Depo.* Exh. A. By comparing the demographic breakdowns of those who were disciplined with the staff as a whole, Dr. Zickar concluded "that black women and white women were twice as likely to be disciplined for unauthorized relationships compared to white men and black men."

*Zickar Depo.* Exh. A, pp. 4, 7, 10; *Zickar Depo.*, pp. 51-53.[24]  For example, African-American females comprised 8.4% of the total staff, but accounted for 19.7% of the total employees disciplined on this basis.  *Zickar Depo.* Exh. A, p. 6; *Zickar Depo.*, pp. 51-52.  Caucasian females accounted for 59.2% of the identified discipline, but comprised only 23.2% of the total staff.  *Id.*

Defendants argue that plaintiff fails to establish a *prima facie* case of disparate impact because she fails to eliminate the most common nondiscriminatory explanations for the disparity.  *Motion for Summary Judgment*, p. 20.  Defendants contend that even Dr. Zickar acknowledged that "there are several likely explanations for the disproportionate number of female employees who are disciplined for unauthorized relationships."  *Id.* (quoting *Zickar Depo.* Exh. A, p. 10) (internal quotation marks omitted).  For example, Dr. Zickar acknowledged that heterosexual relationships predominate in society; it follows that female employees are more likely to engage in unauthorized romantic relationships when the majority of the ODRC inmates are men.  *Id.* (citing *Zickar Depo.* Exh. A, p. 10).  Significantly, 72.6% of employees disciplined for unauthorized relationships at ODRC's all-female institution were men.  *Id.* at 20-21.  In addition, defendants note that, of 305 identified instances of discipline, there were only six instances in which the employee was not terminated, (by either removal or resignation); defendants argue that Rule 46 is uniformally applied.  *Id.* (citing *Zickar Depo.*, pp. 74-81).

---

[24]Dr. Zickar concluded that race alone was not a statistically significant factor in the imposition of discipline.  *Zickar Depo.*, pp. 53-55; *Zickar Depo.* Exh. A.

Plaintiff concedes that she "must rule out the most common nondiscriminatory explanations for the disparity," *Memo. Contra*, p. 34, but emphasizes Dr. Zickar's conclusion that a gender disparity exists. Plaintiff discounts her expert's nondiscriminatory explanations for the disparity. *Id*. at 33-38. Noting that 35.7% of the unauthorized relationships involving women included intimate or sexual relationships, plaintiff points out that "two-thirds of the unauthorized relationships were *not* related to heterosexual relationships." *Id*. at 35 (citing *Zickar Depo*. Exh. C[25]) (emphasis in original). Plaintiff argues that Dr. Zickar's theory of heterosexual relationships does not explain the large gender disparity in the imposition of discipline under Rule 46. *Id*. Plaintiff also argues that Dr. Zickar's theory amounts to a gender-based stereotype that the Court should reject. *Id*. at 36-37. In response to defendants' observation that most instances of discipline resulted in the termination of employment, plaintiff argues that the form of discipline ultimately imposed is irrelevant because "nearly 80% of the people charged were women while they comprise less than one third of the total staff." *Id*. at 38.

In reply, defendants argue that, although plaintiff attempts to rebut her own expert's explanations for any gender disparity, she cannot show that Rule 46 caused the alleged adverse impact. *Reply*, at 16-18. Defendants also criticize plaintiff's characterizations of the unauthorized relationships identified in Dr. Zickar's analysis because

---

[25]*Zickar Depo*. Exh. C is a summary of the background information of the individuals charged with an unauthorized relationship policy violation. *Zickar Depo*., pp. 82-83.

they are based only on "extremely brief descriptions" contained in *Zickar Depo.* Exh. C. *Id*. at 17.

Defendants' arguments are well-taken. Plaintiff has failed to rule out the most common nondiscriminatory explanations for the disparity in the statistical evidence. *See*, *e.g.*, *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 473 (S.D. Ohio 2001) (citing *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1045 (7th Cir. 1991)), *aff'd by Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565 (6th Cir. 2004); *Szurlinski v. Union Twp.*, No. C-1-04-743, 2006 U.S. Dist. LEXIS 78830, at *28 (S.D. Ohio Oct. 24, 2006) (citing *Bender v. Hect's Dep't Stores*, 455 F.3d 612, 622 (6th Cir. 2006)). Plaintiff's own expert cautioned that "several likely explanations" exist for the apparent gender disparity in discipline. *Zickar Depo.* Exh. A, p. 10. Dr. Zickar first explained that female employees were more likely to be approached romantically because (1) most of the inmates were male and (2) heterosexual relationships account for most of the romantic relationships in our society. *Id*. The statistics from ODRC's all-female institution further bolster this explanation: male employees account for 72.7% of the disciplinary action for unauthorized relationships when the inmates are women. *Id*. Dr. Zickar next explains that it is a "well-known finding in psychology that women" tend to be more trusting and sympathetic, which results in increased susceptibility to unauthorized relationships. *Id*.

Plaintiff wishes to adopt only selected aspects of Dr. Zickar's analysis. She agrees that a gender disparity exists, but rejects Dr. Zickar's nondiscriminatory explanations for that disparity. Specifically, plaintiff criticizes Dr. Zickar's conclusion that women

are more trusting than men, which relied on a psychology article examining gender differences in personality. *Memo. Contra*, pp. 35-37 (citing *Zickar Depo*. Exh. A, p. 13 (Feingold, A. (1994)). "Gender differences in personality: A meta-analysis." *Psychological Bulletin, 116*, 429-256). Plaintiff's attempt to attack her own expert's explanation of the gender disparity is unpersuasive. First, by arguing that the Court should reject one of Dr. Zickar's conclusions because of his reliance on a particular source, plaintiff undermines *all* of Dr. Zickar's findings. Stated differently, plaintiff's argument implicitly suggests that the Court should discount the basis for *any* conclusion in Dr. Zickar's analysis, including that of gender disparity, if his sources are unreliable. Second, through plaintiff's own submission, Dr. Zickar is a psychology professor at the University of Bowling Green specializing in psychology in the workplace. *Zickar Depo.*, p. 10; *Zickar Depo.* Exh. A, pp. 15-23. Moreover, it is not apparent why the Court should accept plaintiff's own lay opinions over that of her expert, a trained psychologist.

Plaintiff's attempt to discredit Dr. Zickar through her own informal statistics is also unpersuasive. Plaintiff asserts that only 85, or 35.7%, of the 238 unauthorized relationships involving women "included facts that would suggest an intimate or sexual relationship." *Memo. Contra*, p. 35. Plaintiff therefore concludes that "Dr. Zickar's heterosexual relationships theory only accounts for a small portion of the gender disparity." *Id*. However, plaintiff does not explain what method she employed or factors she considered in characterizing the relationships as intimate or sexual. Instead, plaintiff merely states generally that she used "facts" that "suggest"

such a relationship. *Id.* The Court is not obliged to assume that such statements and analyses are reliable. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996 (1988). Under these circumstances, the Court does not find plaintiff's own statistics useful. *See Isabel v. City of Memphis*, 404 F.3d 404, 412 (6th Cir. 2005) (recognizing that the usefulness of statistics depends upon the surrounding facts and circumstances) (quoting *Teamsters v. United States*, 431 U.S. 324, 339-40 (1977)). Plaintiff's piecemeal approach to her expert's analysis undermines her position and is insufficient to establish a *prima facie* case of disparate impact based on sex or gender. Accordingly, as to Count Three of the *First Amended Complaint*, the *Motion for Summary Judgment* is **GRANTED**.

## IV. FREEDOM OF ASSOCIATION (COUNT EIGHT)

### A. Section 1983

As discussed *supra*, plaintiff was terminated from her employment for her alleged violation of Rule 46(B). *King Depo.* Exh. A; *Brooks Depo.* Exh. 3, p. 10. In Count Eight of the *First Amended Complaint*, plaintiff contends that she was deprived of rights secured by the Constitution of the United States in violation of 42 U.S.C. § 1983. *First Am. Comp.*, ¶ 90.

To state a colorable claim under Section 1983,[26] a plaintiff must

---

[26]Section 1983 provides in relevant part:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

allege the violation of a right secured by the federal constitution or laws by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because Section 1983 is a method for vindicating federal rights, and is not itself a source of substantive rights, the first step in an action under Section 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

In moving for summary judgment on claims under Section 1983, defendants raise a qualified immunity defense. *Motion for Summary Judgment*. "The affirmative defense of qualified, or good faith, immunity shields 'government officials performing discretionary functions . . . from [Section 1983] liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gardenhire v. Schubert*, 205 F.3d 303, 310-11 (6th Cir. 2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "An official may, however, be held personally liable for civil damages for unlawful official action if that action was not objectively reasonable in light of the legal rules that were 'clearly established' at the time it was taken." *Id.*, at 311 (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "This 'objective legal reasonableness' standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

When determining whether a right is "clearly established," this Court must look first to decisions of the Supreme Court, then to decisions of the United States Court of Appeals for the Sixth Circuit and other courts within this circuit, and finally to decisions of other circuits. *See Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gardenhire*, 205 F.3d at 311 (citing *Creighton*, 483 U.S. at 640). However, "this not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Creighton*, 483 U.S. at 640 (citations omitted).

"Where a defendant moves for summary judgment based on qualified immunity, the plaintiff must first identify a clearly established right alleged to have been violated and, second, establish that a reasonable officer in the defendant's position should have known that his conduct violated that right." *Gardenhire*, 205 F.3d at 311 (citing *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) and *Johnson v. Estate of Laccheo*, 935 F.2d 109, 111 (6th Cir. 1991)). The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Id*. (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

B.      **Freedom of Association Standard**

Plaintiff alleges that enforcement of the Standards of Employee Conduct and Rule 46 violates her right to freedom of association as

secured by the First Amendment to the United States Constitution. *First Am. Comp.*, ¶¶ 89-93. The Constitution of the United States protects two distinct types of association: (1) freedom of expressive association, which is protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Akers v. McGinnis*, 352 F.3d 1030, 1035-36 (6th Cir. 2003) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)). Plaintiff's allegations that Rule 46 infringes her right to intimate association, as opposed to her right to expressive association, therefore invokes the Fourteenth Amendment. *First Am. Comp.*, ¶¶ 89-93; *Memo. Contra*, pp. 41-51; *Akers*, 352 F.3d at 1035; *Thompson v. Ashe*, 250 F.3d 399, 406 n.1 (6th Cir. 2001) ("The freedom to associate guaranteed by the First Amendment protects associational interests related to speech and petition.").

The United States Supreme Court "has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts*, 468 U.S. at 617-18. The Sixth Circuit has held that alleged violations of the right to intimate association will be reviewed under the rational basis standard unless there is a "direct and substantial" burden on intimate association; in the latter circumstance, review will proceed under the intermediate or strict scrutiny standard. *See Akers*, 352 F.3d at 1040. A "direct and substantial" burden on intimate association is one that presents an absolute bar to, or makes the majority of the

population ineligible for, intimate associations. *Id*. In *Akers*, for
example, the Sixth Circuit reviewed a Michigan Department of
Rehabilitation rule, similar to Rule 46, and concluded that its effect
on one percent of the population was insufficient to require
application of heightened scrutiny standard and, furthermore, that
this would be true even if the rule prevented ten percent of the
population from intimate associations. *Id*. at 1040-41.

### C. Challenge to Standards of Employee Conduct

As an initial matter, the Court notes that plaintiff alleges in
the *First Amended Complaint* that both "the [Standards of Employee
Conduct] *and* Rule 46" deprive her of her right to choose "whether to
enter into and maintain intimate personal relationships [which] is
within the zone of privacy afforded *some* constitutional protection[.]"
*First Am. Comp.*, ¶¶ 90, 92 (emphasis added). However, plaintiff does
not address the Standards of Employee Conduct as a whole, but rather
focuses only on Rule 46. *See*, *e.g.*, *Memo. Contra*, pp. 41-57.
Accordingly, the Court assumes that plaintiff has either abandoned her
challenge to the Standards of Employee Conduct as a whole, or
originally intended to challenge only Rule 46. Therefore, the Court
will address only plaintiff's specific challenge to Rule 46.

### D. Text of Rule 46

At the time of plaintiff's discipline in 2004, Rule 46(B)
prohibited unauthorized "personal or business relationship(s) with any
individual currently or formerly under the supervision of the
Department or friends or family of same." *Brooks Depo*. Exh. 3, p. 18;
*Brooks Depo*., pp. 21-22, 44-45. In October, 2004, the Standards of

Employee Conduct, including Rule 46, were modified. *Brooks Depo.* Exh.
4; *Brooks Depo.*, pp. 24-26. The revised version of Rule 46(B) deleted
the modifier "formerly," thereby prohibiting unauthorized "personal or
business relationship(s) with any individual currently under the
supervision of the Department or friends or family of same." *Brooks
Depo.* Exh. 4, p. 16.

### E.  Discussion

The parties disagree as to whether Rule 46 presents a "direct and
substantial" burden on intimate association. Plaintiff contends that
it does and defendants contend that it does not. More specifically,
plaintiff argues that the percentage of the population affected by
Rule 46's prohibition "is significantly higher than that in *Akers*."
*Memo. Contra*, pp. 42-43. In so arguing, plaintiff relies heavily on
several print-outs from different websites, which purportedly reflect
statistics regarding: (1) inmate, parolee and civilian populations;
(2) racial disparity in incarceration rates; and (3) where minorities
predominantly reside in Ohio. *See id.*, pp. 43-49; Exhibits 2, 3, 4,
6, 7 and 8, attached thereto.

To be admissible in summary judgment, documents must be
authenticated by and attached to an affidavit that meets the
requirements of Rule 56(e) of the Federal Rules of Civil Procedure.
*See*, *e.g.*, *Fox v. Michigan State Police Dep't*, No. 04-2078, 173 Fed.
Appx. 372, at *375 (6th Cir. Feb. 24, 2006) (affirming decision to
disregard unauthenticated documents that were unsworn and uncertified
and therefore inadmissible); *Lomax v. Sears, Roebuck & Co.*, No.
99-6589, 2000 U.S. App. LEXIS 33884, at *5 (6th Cir. Dec. 19, 2000)

(noting that the district court properly concluded that audio tapes and related transcripts were inadmissible because they were not authenticated); *Steele v. Jennings*, No. 2:04-CV-189, 2005 U.S. Dist. LEXIS 18703, at *11 (S.D. Ohio Aug. 31, 2005) (granting motion to strike unauthenticated exhibit); *Williams v. United Dairy*, Inc., No. 2:03-cv-868, 2005 U.S. Dist. LEXIS 9349, at *14 (S.D. Ohio April 18, 2005) (striking unauthenticated letter).  Therefore, exhibits that are not authenticated are not proper evidence in connection with a summary judgment motion.  *Id*.  Here, plaintiff's Exhibits 2, 3, 4, 6, 7 and 8 are not attached to an affidavit sufficient under Rule 56(e) and are not properly authenticated.  Accordingly, these exhibits are inadmissible and will be disregarded.

There is no evidence in the record that Rule 46 presents an absolute bar to, or makes the majority of the population ineligible for, intimate associations.  *See Akers*, 352 F.3d at 1040.  Plaintiff cannot establish a "direct and substantial" burden on intimate association in this case and the Court will therefore engage in a rational-basis review.  *Id*. at 1040-41.  Under this review, the Court concludes that Rule 46 is not contrary to the right to intimate association.  There is no admissible evidence that Rule 46 affects ten percent, or even one percent, of the  population.  *Id*.[27]

Accordingly, as it relates to Count Eight of the *First Amended Complaint*, the *Motion for Summary Judgment* is **GRANTED**.

_____

[27]The Court notes that, even if it considered plaintiff's inadmissible evidence, it is unlikely that plaintiff would prevail on this claim.  Plaintiff does not explain how she calculated some of the figures and percentages contained in her analysis. *See, e.g., Memo. Contra*, pp. 43-44.  The failure to explain the calculation method undermines plaintiff's argument and supporting statistics.  The Court simply cannot just assume that plaintiff's calculations are accurate.  *Cf. Watson*, 487 U.S. at 996.

## V.    VOID FOR VAGUENESS (COUNTS FIVE AND SIX)

In Counts Five and Six of the *First Amended Complaint*, plaintiff asserts claims under 42 U.S.C. § 1983, alleging that Rule 46 violates the First Amendment to the United States Constitution because it is unconstitutionally vague.  *First Am. Comp.*, ¶¶ 74-83.[28]  Although Rule 46 "arguably gives DRC employees a reasonable opportunity to know *what* is prohibited, it does not give them a reasonable opportunity to know *who* would trigger an unauthorized relationship."  *Memo. Contra*, p. 52 (emphasis in original).[29]  Plaintiff also argues that "Rule 46 does not apply explicit standards for those who apply them so it will not be enforced in an arbitrary or discriminatory manner."  *Id.* at 53.

Defendants contend that plaintiff lacks standing to challenge the alleged vagueness of Rule 46 because her conduct -- a relationship with a parolee -- "clearly fell within that proscribed by the rules." *Reply*, p. 24.  Even conceding standing, defendants argue that plaintiff's claim must fail because the government, as an employer, is vested with broader powers to regulate the conduct of its employees than it enjoys as a sovereign to regulate the conduct of the general public.  *Id.* at 25.  Defendants also contend that plaintiff cannot establish that Rule 46 is vague because (1) plaintiff in fact knew

---

[28]Plaintiff originally alleged that Rule 46 *and* the Standards of Employee Conduct both violated her First Amendment rights.  *First Am. Comp.*, ¶¶ 74-83. However, for the reasons discussed *supra*, the Court will address only the alleged violations of Rule 46.

[29]The *First Amended Complaint* actually focused on the conduct prohibited by Rule 46.  *Id.* ¶¶ 74-83.  The rule "endow[s] ODRC officials with undue discretion to determine whether given conduct contravenes. . . Rule 46[.]" *Id.* at ¶¶ 77, 81 and 82. Defendants address the merits of plaintiff's new attack on the alleged ambiguity of "who" triggers an unauthorized relationship.  Under these circumstances, the Court will consider the merits of plaintiff's vagueness argument as framed in plaintiff's response to the motion for summary judgment.  *See* Fed. R. Civ. P. 15(a)(2); *Niemi*, 543 F.3d at 307.

"who" would trigger an unauthorized relationship under Rule 46 because she admitted that she received notice of policies explaining Rule 46 and she knew to submit an inmate nexus form; and (2) ODRC maintained and promulgated policies defining an unauthorized relationship. In short, defendants contend that plaintiff was well aware that Rule 46 prohibited a relationship with Mr. Young. *Id.*

Defendants' argument is well-taken. The vagueness doctrine aims "(1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement by police, judges and juries." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F3d 545, 551 (6th Cir. 2007). Therefore, Rule 46 is vague if it fails (1) "to give a person of ordinary intelligence fair notice that [her] contemplated conduct is forbidden[,]" and (2) to establish standards or guidelines to govern conduct. *United States v. Harriss*, 347 U.S. 612, 617 (1954); *Belle Maer Harbor*, 170 F.3d 553, 556-57 (6th Cir. 1999). *See also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

Allegations of vagueness that do not involve First Amendment freedoms "must be examined in light of the facts of the particular case at hand and not as to the [rule's] facial validity." *Belle Maer*, 170 F.3d at 557 (citing, among others, *Columbia Natural Resources v. Tatum*, 58 F.3d 1101, 1109 n.6 (6th Cir. 1995) (stating that the plaintiff had standing only to assert a vagueness challenge as applied to plaintiff's specific conduct rather than a facial challenge).[30] As discussed *supra*, plaintiff complains that Rule 46 violates her right

---

[30]An exception to this general rule exists where criminal sanctions are imposed. In those circumstances, courts may engage in a facial analysis even if the First Amendment is not involved. *Id.* In this case, plaintiff has not alleged that Rule 46 imposes criminal sanctions.

to intimate association under the Fourteenth Amendment. Accordingly, the Court will examine her vagueness challenge under the specific facts of this case.

Rule 46(B) as applied to plaintiff prohibited unauthorized relationships "with any individual(s) currently or formerly under the supervision of the Department or friends or family of same." *Brooks Depo.* Exh. 3, p. 18.[31] Plaintiff allegedly engaged in a relationship with Mr. Young, who was at the time a parolee. *See*, *e.g.*, *Young Depo.*, pp. 6, 56. Plaintiff acknowledged that she had previously received a copy of the Standards of Employee Conduct. *King Depo.*, p. 136; *King Depo.* Exh. I. Plaintiff also admits that she knew that a relationship with Mr. Young, a parolee at the relevant time, would violate Rule 46. *King Depo.*, p. 134. Therefore, plaintiff lacks standing to challenge application of the rule on the basis of vagueness because her conduct -- an alleged relationship with a parolee -- is clearly prohibited by Rule 46. *See*, *e.g.*, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of vagueness of the law as applied to the conduct of others."); *Webster v. County of Saginaw*, 899 F.2d 1223 (6th Cir. 1990) (same); *Nelson v. United States*, 796 F.2d 164, 167 (6th Cir. 1986) ("Dr. Nelson cannot complain of vagueness if her conduct

---

[31]Defendants observe that the version of Rule 46 in place at the time of plaintiff's termination is no longer in effect and that the newer version is arguably less restrictive than the former rule. *Motion for Summary Judgment*, p. 26 (citing *Brooks Depo.*, pp. 24-27; *Brooks Depo.* Exhs. 1, 2). Regardless, defendants contend that plaintiff's alleged relationship with Mr. Young would violate either version of the rule because he was a parolee and still under supervision of ODRC at the time plaintiff began a relationship with Mr. Young. *Id.* For the reasons discussed *supra*, the Court will begin its analysis with the former version of the rule. *See Brooks Depo.* Exh. 3.

was clearly prohibited by [the statute]."). Accordingly, as it relates to Counts Five and Six of the *First Amended Complaint*, the *Motion for Summary Judgment* is **GRANTED**.

## VI.  OVERBREADTH (COUNT SEVEN)

The overbreadth doctrine is "an exception to the traditional rules of standing and is applicable only in First Amendment cases in order to ensure that an overbroad statute [or rule] does not act to 'chill' the exercise of rights guaranteed protection." *Leonardson v. City of East Lansing*, 896 F.2d 190, 195 (6th Cir. 1990) (citing *NAACP v. Button*, 371 U.S. 415, 433 (1963)). If the First Amendment is not implicated, then "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *United States v. Blaszak*, 349 F.3d 881, 888 (6th Cir. 2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (internal quotation marks omitted)). "Invalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Williams*, _ U.S. _, 128 S.Ct. 1830, 1838 (2008) (quoting *Los Angeles Police Dep't v. United Reporting Publishing Corp.*, 528 U.S. 32, 39 (1999) (internal quotation marks omitted)). *See also Phelps-Roper v. Strickland*, 539 F.3d 356, 361 (6th Cir. 2008) (quoting *Williams*, 128 S.Ct. at 1838).

As discussed *supra*, Rule 46 does not interfere with plaintiff's right to freedom of expressive association and the First Amendment is not implicated by the termination of her employment. Because Rule 46 may be constitutionally applied to plaintiff, she "is precluded from

basing [her] overbreadth challenge on the possibility that [Rule 46] could be unconstitutionally applied to others." *Id.* Accordingly, as it relates to Count Seven of the *First Amended Complaint*, the *Motion for Summary Judgment* is **GRANTED.**

**WHEREUPON** *Motion for Summary Judgment or, in the Alternative for Qualified Immunity, of Defendants State of Ohio, Reginald Wilkinson, Terry Collins, Paul Arledge, Cary Sayers, D.J. Norris & William Blaney*, Doc. No. 61, is **GRANTED**. All claims against the moving defendants are **DISMISSED.**

Plaintiff is **ADVISED** that the Court will dismiss all claims against Defendant David M. Pincus unless, within twenty-one (21) days of the date of this *Opinion and Order* plaintiff establishes that service of process has been timely made on this defendant or unless plaintiff establishes good cause for her failure to do so.

January 8, 2009            *s/Norah McCann King*
                           Norah M^cCann King
                    United States Magistrate Judge

51